1  BETSY C. MANIFOLD (182450)
2  RACHELE R. BYRD (190634)
   ALEX J. TRAMONTANO (276666)
3  FERDEZA ZEKIRI (335507)
   **WOLF HALDENSTEIN ADLER**
4    **FREEMAN & HERZ LLP**
   750 B Street, Suite 1820
5  San Diego, CA 92101
   Telephone: (619) 239-4599
6  Facsimile: (619) 234-4599
   manifold@whafh.com
7  byrd@whafh.com
   tramontano@whafh.com
8  zekiri@whafh.com

9  *Attorneys for Plaintiff*

10 [Additional Counsel on Signature Page]

11              UNITED STATES DISTRICT COURT
12              CENTRAL DISTRICT OF CALIFORNIA

13

14 PAIGE MCMURTRIE, derivatively on          Case No. _____
   behalf of FIGS, INC.,
15
                  Plaintiff,                  **VERIFIED SHAREHOLDER**
16                                            **DERIVATIVE COMPLAINT**
           v.
17                                            **JURY TRIAL DEMANDED**
   HEATHER HASSON, CATHERINE
18 SPEAR, JEFFREY D. LAWRENCE,
   DANIELLA TURENSHINE, J. MARTIN
19 WILLHITE, A.G. LAFLEY, JEFFREY
   WILKE, KENNETH LIN, MICHAEL
20 SOENEN, SHEILA ANTRUM,
   CHRISTOPHER VARELAS, and TULCO
21 LLC,

22                Defendants,

23                     and

24 FIGS, INC.,

25                          Nominal Defendant.
26

27

28

Paige McMurtrie ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning herself, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes a review and analysis of: (a) filings in various proceedings, including a class action lawsuit alleging nominal defendant FIGS, Inc. ("FIGS" or the "Company") and its executives violated federal securities laws; (b) the Company's filings with the U.S. Securities and Exchange Commission ("SEC"); (c) FIGS' press releases, website, corporate governance documents, presentations, and conference calls; and (d) analyst reports and other publicly available information concerning the Company and its Board of Directors (the "Board").

## NATURE OF THE ACTION

1.  This stockholder derivative action is brought on behalf of FIGS against certain current and former Company executives and members of the Board (the "Individual Defendants")[1] for, among other things, breaching their fiduciary duties to Company stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements from May 27, 2021 through February 28, 2023 (the "Relevant Period") regarding the Company's business and finances, product demand and inventory, and the adequacy and maintenance of its internal controls.

2.  FIGS is a direct to consumer ("DTC") retailer of premium medical scrubs and other high-end healthcare apparel. FIGS went public in 2021, touting its purported ability to employ precise data analytics, demand forecasting, and efficient

---

[1] The Individual Defendants are Heather Hasson ("Hasson"), Catherine Spear ("Spear"), Jeffrey D. Lawrence ("Lawrence"), Daniella Turenshine ("Turenshine"), J. Martin Willhite ("Willhite"), A.G. Lafley ("Lafley"), Jeffrey Wilke ("Wilke"), Kenneth Lin ("Lin"), Michael Soenen ("Soenen"), Sheila Antrum ("Antrum"), and Christopher Varelas ("Varelas").

supply chain and inventory management strategies. The Individual Defendants claimed these methods enabled the Company to efficiently sell its products while keeping inventory levels minimal, controlling supply chains, minimizing operational costs, and fostering strong customer loyalty.

3.     The Company raised $580.5 million in its initial public offering ("IPO") at the beginning of the Relevant Period, and $412.7 million in a secondary public offering ("SPO") three months later. Of the almost $900 million raised in the two offerings, however, only $96 million went to FIGS. The vast majority of these profits went to the Company's then Co-Chief Executive Officers ("CEOs"), Defendants Hasson and Spear, and Defendant Tulco, LLC ("Tulco"), a venture capital firm which was the Company's majority shareholder prior to the SPO. Defendants Hasson, Spear and Tulco, through beneficial direct and indirect ownership of the Company's shares, and by virtue of a voting agreement executed in connection with the IPO (the "Voting Agreement"), constitute a control group which exercises voting control over FIGS (the "Control Group").

4.     Through the IPO and SPO, the Individual Defendants, who issued materially false and misleading statements about FIGS' data analytics capabilities, were able to artificially inflate the price of the Company's stock and pocket over $1 billion in proceeds from insider sales.

5.     To artificially boost the Company's share price, the Individual Defendants intentionally or recklessly issued, or caused the issuance of, a series of materially false statements and omitted material facts in FIGS' public filings, press releases, and other documents throughout the Relevant Period. These misrepresentations and omissions created a misleading impression that FIGS had an exceptionally effective and low-risk merchandising model, supported by advanced data-related capabilities and a reliable set of non-discretionary core styles. The false statements also indicated that FIGS could efficiently manage inventory and primarily utilize ocean freight instead of airfreight, except in extraordinary

circumstances.

6.     In addition, during the Relevant Period, FIGS engaged in a high-risk merchandising approach that involved developing numerous new styles every quarter, without testing the demand for these styles beforehand. FIGS also either neglected to consider data and analytics when placing purchase orders, or lacked the necessary data capabilities to accurately predict demand. To compensate for this poor demand planning, the Company heavily relied on expensive air freight. As a result, inventory levels, including non-core products, continued to rise, leading to significant cost increases.

7.     Throughout the Relevant Period, the Individual Defendants also caused the Company to fail to maintain adequate internal controls, including with those concerning the accuracy of its public reports, and to make false and misleading statements concerning the same.

8.     Eventually, FIGS was forced to reveal massive inventory bloat, supply chains in chaos, ballooning shipping costs, and product margins that had diminished to near zero. By the end of the Relevant Period, after the truth was finally revealed, the price of the Company's stock had collapsed to just $6.76 per share – a massive decline form the $22 price per share at the IPO and $40.25 per share at the SPO.

9.     As a result of the foregoing, FIGS, its then Co-CEOs Hasson and Spear, and three other members of the current Board (Willhite, Antrum, and Soenen), among several other top Company executives, have been named as defendants in a securities class action lawsuit captioned *Ryan v. FIGS, Inc., et al.*, 2:22-cv-07939-ODW-AGR (C.D. Cal.) (the "Securities Action"), which alleges investors were damaged when they purchased FIGS shares at artificially inflated prices during the Relevant Period.

10.     To make matters worse, during the Relevant Period, while the Company's stock price was artificially inflated, and while in possession of material, adverse non-public Company information, certain of the Individual Defendants sold

significant amounts of their FIGS stock.

11. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-wide damages in the related securities class action, as well as additional losses, including reputational harm and loss of goodwill.

12. Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused because each member of the Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a)(1), and the regulations promulgated thereunder, Rules 10b-5 (17 C.F.R. § 240.10b-5) and 14a-9 (17 C.F.R. § 240.14a-9).

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

# THE PARTIES

## Plaintiff

18.     Plaintiff currently holds shares of FIGS common stock and has been a continuous holder at all relevant times.

## Nominal Defendant

19.     FIGS is a Delaware Corporation with its principal executive offices at 2834 Colorado Avenue, Suite 100, Santa Monica, California.

## The Individual Defendants

20.     Defendant Heather Hasson is the Co-Founder and Executive Chairman of FIGS. She served as Co-CEO and director of the Company from its founding in 2013 until August 4, 2022. On August 4, 2022, Hasson's title and role transitioned to Executive Chair. Hasson reviewed and signed both the IPO Registration Statement and the SPO Registration Statement. As co-CEO, Hasson signed the Company's Forms 10-Q and 10-K, and regularly spoke at events and on conference calls on behalf of the Company. Defendant Hasson, through her beneficial ownership of FIGS stock, and through the Voting Agreement, is part of the Control Group.

21.     Defendant Catherine "Trina" Spear is the Co-Founder and CEO of FIGS and has been a member of the Board since 2013. Spear served as co-CEO, alongside Hasson, from FIGS' founding in 2013 through August 4, 2022. Spear reviewed and signed both the IPO Registration Statement and the SPO Registration Statement. As co-CEO, Spear signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Relevant Period, and regularly spoke at events and on conference calls on behalf of the Company. Hasson and Spear are referred to collectively herein as the "Founders" or "Founder Defendants." Defendant Spear, through her beneficial ownership of FIGS stock, and through the Voting Agreement, is part of the Control Group.

22.     Defendant Jeffrey D. Lawrence was FIGS' Chief Financial Officer ("CFO") from December 2020 to December 2021. Lawrence reviewed and signed both the IPO Registration Statement and the SPO Registration Statement. While CFO, Lawrence signed the Company's Forms 10-Q, 10-K, 8-K, and certain press releases issued during the Relevant Period, and regularly spoke on conference calls on behalf of the Company. On December 10, 2021, before the market opened, FIGS announced the unexpected departure of Defendant Lawrence, effective December 24, 2021, less than one year after he became CFO.

23.     Defendant Daniella Turenshine has been FIGS' CFO since December 2021. Prior to her role as CFO, Turenshine served as FIGS' Senior Vice President of Finance and Strategy from November 2018 to December 2021. As CFO, Turenshine signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Relevant Period, and regularly spoke at events and on conference calls on behalf of the Company.

24.     Defendant J. Martin Willhite has been a member of the Board since February 2019. Willhite has also served as Vice Chairman of Tulco since July 2017. Willhite reviewed and authorized his signature on the IPO Registration Statement and SPO Registration Statement. Willhite also signed the Company's Forms 10-K. Pursuant to the Voting Agreement, Willhite serves as Tulco's representative on the FIGS Board. According to the Company's 2022 proxy statement (defined below), Willhite received $238,824 in compensation from the Company in 2021.

25.     Defendant A.G. Lafley has been a member of the Board since April 2022. Lafley has also served as a member of the board of directors of Tulco since September 2017.

26.     Defendant Jeffrey Wilke has been a member of the Board since April 2022. Wilke is also Chairman of the board of directors of Re:Build, of which Thomas Tull ("Tull"), the founder, Chairman and CEO of Tulco, is also a member.

27.     Defendant Kenneth Lin has been a member of the Board since April

2022. Since March 2007, Ken has been the CEO of Credit Karma, the consumer finance company that he founded.

28.     Defendant Michael Soenen has been a member of the Board since May 2021. Soenen is named as a defendant in the Securities Action. Soenen reviewed and authorized his signature on the false and misleading SPO Offering Documents. According to the Company's 2022 proxy statement, Soenen received $242,736 in compensation from the Company in 2021.

29.     Defendant Sheila Antrum has been a member of the Board since May 2021. Antrum is named as a defendant in the Securities Action. Antrum reviewed and authorized her signature on false and misleading SPO Offering Documents. According to the Company's 2022 proxy statement, Antrum received $236,098 in compensation from the Company in 2021.

30.     Defendant Christopher Varelas joined FIGS' Board in connection with the IPO until he suddenly retired in August 2021. As a "controlled company" beholden to its Founders and Tulco, FIGS had just three independent directors (out of a total of six directors) immediately after the IPO and Varelas held the important position of "lead independent director." In the role of lead independent director, he was responsible for presiding over periodic meetings of the independent directors and serving as a liaison between the chairperson of the Board and the independent directors, among other duties. Varelas was on each of the Board's three committees and served as head of the Audit Committee. Curiously though, after only a few months on the job, on August 8, 2021, he resigned.

31.     Defendant Tulco is a venture capital investment firm founded and controlled by Thomas Tull. At all relevant times, Tulco was part of the Control Group through its beneficial ownership of FIGS common stock and under the Voting Agreement. In addition, under the Voting Agreement, Tulco was entitled to appoint a director to the FIGS Board. Throughout the Relevant Period, with Defendant Willhite served on the Board as Tulco's representative. In addition, Defendant

Lafley, a Tulco director since September 2017, joined FIGS' Board in April 2022.

32.  According to the October 23, 2020 Amended and Restated Stockholders' Agreement between Hasson, Spear, Tulco, and Tull ("2020 Stockholders' Agreement"), FIGS could not undertake any of the following actions, *inter alia*, without "first obtaining the affirmative approval of the Tulco Director" or "until such time as a majority of the members of the Board are designated by Tulco or the Tulco Director":

- "any material change to the lines of business conducted by the Company and its subsidiaries";
- "any approval of the Budget of the Company for any Fiscal Year or any amendment, modification or supplement thereto";
- "any material deviation from the then-current Budget, including, for the avoidance of doubt, any unbudgeted expenditures in excess of 20% of the aggregate amount of budgeted expenditures in such Budget";
- "any award, determination or payment by the Company or any of its subsidiaries of any bonus or other discretionary or incentive compensation to a Founder";
- "any amendment, restatement, replacement, or modification of any employment agreement or restrictive covenant agreement with any Founder, including, without limitation, any modification to any compensation arrangements with any Founder";
- "the undertaking of a firm commitment underwritten initial public offering under the Securities Act of any Securities or other equity interests in the Company or the direct listing of the Company on a securities exchange (an 'IPO')";
- "any commencement, termination, compromise or settlement of any material litigation, lawsuit, action, dispute or other proceeding or

otherwise assuming any material liability, or agreeing to the provision of any equitable relief, by the Company";

- "any amendment, modification, repeal or waiver of any provision of the Organizational Documents or the organizational documents of any subsidiaries of the Company";

- "any Company Sale or other reorganization, merger, share exchange, share transfer, consolidation, business combination or similar transaction"; or

- "the liquidation, winding up or dissolution of the Company or filing of any voluntary petition in bankruptcy or insolvency."

33. The 2020 Stockholder's Agreement also described three circumstances under which the Tulco Defendants could fill board vacancies for its own seat and those of the founders: (i) if one founder (i.e., Hasson or Spear) was no longer on the Board, then the remaining founder and the Tulco Director sitting on the Board (i.e., Willhite) would fill the vacancy unanimously; (ii) if neither founder remained on the Board, then the Tulco Director would appoint someone to fill the vacancy; and (iii) if the Tulco Director no longer served on the Board, then Tulco would appoint someone to fill the vacancy.

34. According to the Voting Agreement by and among FIGS, Hasson, Spear, Tulco, and certain related parties ("the Voting Agreement"), which was entered into contemporaneously with and became effective immediately after FIGS' IPO, Hasson, Spear, and Tulco were required to vote all of their shares in favor of the election or re-election of the Tulco Director that was duly nominated for election or re-election to the Board "[f]or as long as the aggregate number of outstanding shares of Common Stock held by Tulco and its Permitted Transferees represent[ed] at least 10% of the aggregate number of outstanding shares of all classes of Common Stock." Under the Voting Agreement, Hasson, Spear, and Tulco were also required

to vote all of their shares against any attempts to remove Hasson, Spear, or the Tulco Director from the Board.

35.   Prior to FIGS' IPO, the Tulco Defendants exercised majority control (51.1%) of the total voting power of the Company's shareholders.

## DEFENDANTS' FIDUCIARY DUTIES

36.   By reason of their positions as officers, directors, and/or because of the control they exercise over the business and corporate affairs of FIGS, the Individual Defendants owed FIGS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

37.   The Individual Defendants were and are required to act in furtherance of the best interests of FIGS and its shareholders to benefit all shareholders equally and not in furtherance of their own person interest or benefit.

38.   Each director, officer, and Control Group member of the Company owes to FIGS and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

39.   The officers, directors, and Control Group member of FIGS were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

40.   Each Individual Defendant, under his/her position as a director, officer, and/or Control Group member of FIGS owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. To discharge their duties, officers, directors, and Control Group members of FIGS were required to, among other things:

a) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable district, state, and federal laws rules, regulations, and requirements, and pursuant to FIGS'

Code of Conduct and internal guidelines;

b) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to provide the highest quality performance of its business;

c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

d) Maintain and implement and adequate system of internal legal, financial, and management controls to ensure that FIGS' operations would comply with all laws and that FIGS' regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

e) Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company; and

f) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to rectify the misconduct and prevent its recurrence.

41.    The Individual Defendants had a duty to prevent the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings and business prospect. As fiduciaries, the Individual Defendants had a duty to disclose in regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

42.    The Individual Defendants, because of their position of authority as directors, officers, and/or Control Group members of FIGS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of

herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of FIGS, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall

contribution to and furtherance of the wrongdoing.

48.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of FIGS and at all times acted within the course and scope of such agency.

## FIGS'S CODE OF ETHICS

49.    FIGS' Code of Business Conduct and Ethics ("Code of Conduct") is applicable to all of the Individual Defendants and states, "it is Company policy that any employee or director who violates this Code will be subject to appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company."

50.    With respect to Conflicts of Interest, the Code of Conduct states:

Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. . . .

The following situations might reasonably be expected to give rise to a conflict of interest and should be identified to, and addressed by, the Chief Legal Officer or General Counsel or the Board of Directors:

- Outside Employment. An employee being employed by, serving as a director of, or providing any services to a company that the individual knows or suspects is a material customer, supplier or competitor of the Company (other than services to be provided as part of an employee's job responsibilities for the Company).

- Improper Personal Benefits. An employee or director

13

obtaining any material (as to him or her) personal benefits or favors because of his or her position with the Company. Please see "Gifts and Entertainment" below for additional guidelines in this area.

\* \* \*

- <u>Loans or Other Financial Transactions</u>. An employee or director obtaining loans or guarantees of personal obligations from, or entering into any other personal financial transaction with, any company that the individual knows or suspects is a material customer, supplier or competitor of the Company. This guideline does not prohibit arms-length transactions with banks, brokerage firms or other financial institutions.

- <u>Service on Boards and Committees</u>. An employee or director serving on a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests reasonably would be expected to conflict with those of the Company.

51.    With respect to competition and unfair dealing, the Code of Conduct states:

All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they

14

employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

52. In the Section titled, Accuracy of Financial Reports and Other Public Communications, the Code of Conduct states:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

53. The Code of Conduct states that, "[i]n addition to the above," [Y]ou must obtain approval from any of the Company's Chief Executive Officers, Chief Legal Officer or General Counsel or Chief Financial Officer for any work activity that requires communication with any member or employee of a legislative body or with any government official or employee. Work activities covered by this policy include meetings with legislators or members of their staffs or with senior executive branch officials on behalf of the Company.

Preparation, research and other background activities that are done in support of lobbying communication are also covered by this policy even if the communication ultimately is not made. If any doubt exists about whether a given work activity would be considered covered by this provision, you should seek advice immediately from your supervisor and the Company's Chief Legal Officer or General Counsel.

54.     In the section titled, Compliance with Insider Trading Laws, the Code of Conduct states:

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's Chief Legal Officer or General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider

trading laws.

55.    In the Section titled, Public Communication and Regulation FD, the Code of Conduct states:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

> In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders, we must also disclose the information to the public. The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company to analysts, institutional investors, other stockholders or representatives of the

media, except at the request of the Company's designated spokespersons.

56. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

57. Hasson and Spear also violated the Code of Conduct by engaging in insider trading.

58. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## FIGS'S AUDIT COMMITTEE CHARTER

59. FIGS' Audit Committee maintains a charter (the "Audit Charter") which states its purpose is to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established."

60. The Audit Charter vests the Audit Committee with at least the following responsibilities:

The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any

independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence. . . .

The Committee must discuss with the independent auditor any audit problems or difficulties and management's response. . . .

The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations. . . ."

The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements. . . .

The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations. . . ."

The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. . . .

The Committee must discuss the Company's policies with respect to risk assessment and risk management.

\* \* \*

The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing

matters. . . .

The Committee must review any related person transactions brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements. . . .

The Committee must report regularly to the Board regarding the activities of the Committee.

61.    In violation of the Audit Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

## SUBSTANTIVE ALLEGATIONS

62.    As a result of increased demand for its core scrub products and the shift to online sales during the COVID-19 pandemic, FIGS saw explosive growth in 2020. From 2018 to 2020, revenue grew nearly 400%, from $55 million in 2018 to $260 million in 2020.

63.    In early 2021, prior to the IPO, FIGS pivoted away from its core products and began developing a plethora of new styles each quarter. By the end of 2021, FIGS had produced more than 100 new styles.

64.    Inventory management is and was critical to FIGS' operations. Inventory shortages create difficulty in meeting demand, which can lead to lost sales opportunities, customer dissatisfaction, and a loss of repeat purchasers. At the time of its IPO, about 60% of its customers were repeat customers. Conversely, excess inventory carries higher costs arising from increased storage, maintenance, and fulfillment demands, amongst others.

65.    The Company's non-core inventories drastically increased throughout 2021 and 2022, with many new styles not selling well. By the end of the second quarter of 2022, despite core styles making up 80% of revenues, the Company held just as much core as non-core inventory: "Of the remaining inventory in our

warehouse, approximately 50% is in core styles and core colors . . . ." This change created extremely risky conditions with respect to demand planning and inventory management – despite the Company advertising repeatedly that its demand planning and inventory management were second to none in the industry. The Company began placing purchase orders for products and styles for which demand had not been demonstrated, creating risk that inventory would not sell or would take a long time to convert from inventory into sale.

66.     FIGS' pivot from its core-product strategy and its inability to reliably predict buying patterns, caused excessive inventory buildup. FIGS' days of inventory outstanding increased in nearly every quarter from the IPO onward, reaching an average of 365 days during Q3 2022. FIGS' ideal inventory level, as Defendants later acknowledged on February 28, 2023, is around 16 to 20 weeks of supply (i.e., 112 to 140 days). By Q2 2021, FIGS' inventory growth had outpaced its sales growth and by Q2 2022 its net inventory actually exceeded its net sales. FIGS' rising days of inventory outstanding did not result from macro factors. Indeed, FIGS' days of inventory outstanding both exceeded and outpaced comparable companies.

67.     To manage inventory, consumer goods companies rely on a technique known as "demand planning" which involves collecting, organizing, analyzing, and modeling historical data and current trends, and then making supply chain decisions in accordance with that data.

68.     FIGS claimed that it had data analytics and demand planning that created efficiencies throughout every aspect of its business. FIGS touted a centralized Data Science team that could utilize the data the Company harvested from its customers to drive decision making throughout the Company and build proprietary data science solutions applied to key functions including marketing and customer experience, product, supply chain, merchandising, and inventory management. Defendants also claim that FIGS benefitted from its relationship with

Shopify, an e-commerce platform that can integrate with websites of sellers such as FIGS. Through Shopify, FIGS purportedly has access to data concerning product performance and sales metrics that are "up to date" within about a minute, including, inter alia, gross sales, returns, starting and ending inventory quantities, days of inventory on hand, and sell-through rates.

69.     Though FIGS publicly claimed that it was using such data capabilities to reliably predict buying patterns, determine inventory needs, create supply chain efficiencies, and anticipate optimal times for product launch down to the day and time, behind the scenes, FIGS was unexpectedly relying on air freight to bring in products, delaying product launches, and running out of core products while inventory levels were simultaneously ballooning as a result of the Company's departure from its core products strategy.

70.     FIGS experienced significant increases to its expenses as a result of departing from its core-product strategy and inability to reliably predict buying patterns.

71.     The Company incurred significant expense, particularly in 2021 and the first half of 2022, as a result of its heavy reliance on air freight to ship products from its manufacturers in Asia. Despite their statements to the contrary, Defendants actually relied on air freight as a measure of first resort to compensate for inadequate demand planning.

72.     The Company incurred significant inventory holding expenses and FIGS' selling expenses rose commensurately. FIGS' promotional pricing measures, combined with increasing expenses related to air freight and inventory holding costs, drove FIGS' previously healthy margins to near zero.

73.     The truth about FIGS began to leak into the market, and the Company's promises about its DTC model and data capabilities proved illusory as merchandising problems plagued the Company and inventory levels ballooned.

74.     Defendants misrepresented that FIGS had an exceptionally effective

and low-risk merchandising model, supported by advanced data-related capabilities and a reliable set of non-discretionary core styles. This false impression suggested that FIGS could efficiently manage inventory and primarily utilize ocean freight for freight-in, except in extraordinary circumstances such as those caused by COVID-19. In addition, during the Relevant Period, FIGS engaged in a high-risk merchandising approach that involved developing numerous new styles every quarter, without testing the demand for these styles beforehand. FIGS also either neglected to consider data and analytics when placing purchase orders or lacked the necessary data capabilities to accurately predict demand. To compensate for poor demand planning, the company heavily relied on expensive air freight. As a result, inventory levels, including non-core products, continued to rise, leading to significant costs. Throughout the Relevant Period, Defendants also failed to maintain adequate internal controls, including with respect to the accuracy of its public reports.

75.     On May 24, 2021, FIGS filed its Registration Statement with the SEC for purposes of facilitating its IPO (collectively with the May 5 and May 20 iterations of the Registration Statement, the "IPO Registration Statement"). The SEC declared the IPO Registration Statement effective on May 26, 2021.

76.     On May 28, 2021, Defendants filed a Prospectus on Form 424B4 (collectively with the IPO Registration Statement, the "IPO Offering Documents"), which represented that the Company was offering 4,636,364 shares of FIGS' common stock and Tulco and Tull were offering an additional 21,749,999 shares of FIGS' common stock for $22.00 per share.

77.     The IPO Offering Documents misrepresented that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy"

focused on its core products rather than rapid development of hundreds of new products.

78.     The IPO Offering Documents misrepresented that air freight was being used only as a response to supply chain disruptions arising from the COVID-19 pandemic, failing to disclose the true frequency and additional reasons FIGS utilized the more expensive shipping method.

79.     The IPO Offering Documents were signed by Hasson, Spear, and Lawrence. Willhite, acting within the scope of his authority as a director of FIGS and as a representative agent of Tulco, also authorized his signature on the IPO Offering Documents.

80.     In the IPO Offering Documents, FIGS portrayed itself as a data-focused company with advanced data-tracking capabilities. These capabilities were presented as unique assets that differentiated FIGS from its competition. For example, under a boldface header on the second page reading "We Leverage Data Science to Connect with and Serve Our Community," the Company claimed:

> We develop proprietary and customized data solutions designed to optimize our product innovation, inventory analytics, marketing efforts and operational efficiency. We maintain . . . Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the Company. This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes.

81.     The Company repeatedly claimed that its access to customer data allowed for accurate demand prediction: "Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns."

82.     The Company also claimed to pay particular attention to "demographic, geographic and psychographic data that enables us to reliably predict buying patterns, leading to operational efficiencies throughout our supply chain, inventory management and new product development."

83.     The Company also emphasized for investors that FIGS was a low-risk company due to its primary business being uniforms rather than more discretionary apparel: "Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

84.     Similarly, the Company claimed that it could minimize inventory risk by being careful with its purchasing decisions. Under a boldface heading reading "Highly Effective Merchandising and Product Launch Model," the Company claimed: "For our limited edition colors and styles, we utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity." The Company continued: "This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency."

85.     The Company made the following representations in a paragraph under the boldface header "Supply Chain":

> We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics). By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency.

86.     Additionally, the Company made the following representations in a paragraph under the boldface header "Merchandising and Inventory Management":

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers. This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers. It also enables us to manage purchasing and inventory effectively and efficiently. We use data-driven models to predict and anticipate demand for our products. The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques. Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day.

87.   In the Management Discussion and Analysis section of the IPO Offering Documents, the Company made the following misrepresentation:

We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings. In 2020, we generated 82% of net revenues from our 13 core scrubwear styles, 5% of net revenues from limited edition scrubwear styles, and the remaining 13% from our lifestyle apparel and other non-scrub offerings.

88.   In the IPO Offering Documents, the Company acknowledged that certain air freight expenditures had been higher than planned, but indicated that this was a temporary effect of the pandemic and was not expected to last:

Certain of the Company's suppliers experienced delays and shutdowns due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet its customers' expectations, the Company increased the use of more costly air freight during 2020 and during the

three months ended March 31, 2021, which increased cost of goods sold. The Company has not experienced the pandemic's adverse impacts in any additional material respect.

89.     These statements were false and misleading when made, because Defendants falsely attributed FIGS' "increased" "use of more costly air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain. Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

90.     On June 1, 2021, Defendants announced the closing of the Company's IPO wherein FIGS, Tulco, and Tull offered 30,344,317 shares of its common stock. The total amount raised in the IPO was approximately $546 million, with less than $96 million going to the Company and the vast majority of the amount raised, approximately $450 million, going to Tulco and Tull.

91.     On August 12, 2021, FIGS announced its Q2 2021 results on SEC Form 10-Q signed by Spear, Hasson, and Lawrence, and hosted an investor conference call (the "Q2 2021 Earnings Call") in which the Defendants again misrepresented FIGS' ability to predict demand, commitment to a core products strategy, and use of air freight.

92.     During the Q2 2021 Earnings Call, Spear stated the following: By having a direct relationship with our customers, we have access to hundreds of data attributes associated with millions of customer accounts. And by understanding their buying patterns, we're able to make increasingly accurate predictions about the products they're likely to buy, how often they're likely to buy them and the quantities they're likely to buy them in.

93.     On that same call, in response to an analyst question regarding the Company's use of air freight, Lawrence assured analysts that "[w]e have a very well-healed [sic] and sophisticated inventory planning capabilities."

94.     In the Form 10-Q released on August 12, 2021, Defendants made the following false and misleading representation:

> We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

95.     During the earnings call on that same day, in response to an analyst question regarding the Company's use of air freight, Lawrence replied: "We have a very well-healed [sic] and sophisticated inventory planning capabilities [G]oing forward, on the other side of the pandemic, again, given our inventory plan and capabilities we have today, continued investments that we'll do there, this is largely going to be ocean in the out-years." Furthermore, despite the Company already utilizing air freight that was eroding margins, Lawrence also speculatively claimed that FIGS "could see downward pressure on gross margin, if we choose to air freight in the products that we know our customers love."

96.     A little more than three months after Defendants sold 30.3 million shares to the public in the IPO, Hasson, Spear, Tulco, and Tull sold an additional 10.1 million shares in an SPO.

97.    The SPO was designed to benefit Hasson, Spear, Tulco, and Tull as the selling stockholders. Indeed, the September 15, 2021 announcement expressly stated that "FIGS will not receive any proceeds from the sale of shares in the offering."

98.    On September 17, 2021, Defendants filed a Prospectus on Form 424B4 (the "SPO Prospectus" and, collectively with the September 14, 2021 Form S-1 and the September 15, 2021 Form S-1MEF, the "SPO Offering Documents").

99.    Through the SPO, Hasson and Spear sold 3,888,322 shares of FIGS common stock at a price of $40.25 per share, resulting in total proceeds of $156,504,960.50. Further, Tulco and Tull sold 6,366,670 shares of FIGS common stock at a price of $40.25 per share, resulting in proceeds of $256,258,468.

100.    The SPO Offering Documents contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein not materially misleading.

101.    Specifically, the SPO Offering Documents reiterated and perpetuated the earlier misrepresentations that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products rather than rapid development of hundreds of new products.

102.    The SPO Offering Documents were signed by Spear, Hasson, and Lawrence. Willhite authorized his signature on the SPO Offering Documents, acting within the scope of his authority as a representative agent of Tulco.

103.    In the SPO Offering Documents, FIGS repeated multiple claims it had made in the IPO Offering Documents, such as:

> Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns. This leads to operational efficiencies

29

throughout our supply chain, inventory management and new product development.

104.   The Company continued to emphasize the tech-forward and data-heavy nature of its operations:

We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the company. This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes.

105.   Management's discussion of their business in the SPO Offering Documents also emphasized FIGS' ability to manage its manufacturing, supply chain, and inventory. They wrote:

We directly and actively manage every step of our product development and production process to ensure that our extremely high quality standards are met. We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings.

106.   In the SPO Offering Documents, FIGS further claimed, beneath a boldface header reading "Our Data Analytics":

In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey. These extensive data sets are used to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management, marketing and customer experience.

107.   Under the boldface heading "Supply Chain," they continued:

We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics). By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency.

108.   In the next paragraph, underneath the boldface heading "Merchandising and Inventory Management," the Company claimed:

> Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers. This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers. It also enables us to manage purchasing and inventory effectively and efficiently. We use data-driven models to predict and anticipate demand for our products. The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques. Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day.

109.   In addition, the SPO Offering Documents contained the following false and misleading statement, reiterated several times in substantially similar form, with respect to the Company's use of air freight and the reasons therefore:

> We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced

shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

110.   On November 10, 2021, the Company released Q3 2021 results on SEC Form 10-Q, signed by Hasson, Spear, and Lawrence, and held a conference call the same day (the "Q3 2021 Earnings Call"). The Company reported that Adjusted EBITDA margin had declined from 33.5% to 21.6% quarter-over-quarter, and COGS had increased from $20.1 million to $28 million, which the company attributed partially to "faster but more expensive air freight" and partially to an increase in order volume.

111.   During the Q3 2021 Earnings Call, and in the Form 10-Q, Hasson, Spear, and Lawrence made false and misleading statements designed to downplay the impact of increased air freight and reassure investors that FIGS' maintained low inventory risk due to its core products strategy and data analytics capabilities. These statements maintained artificial inflation in the price of FIGS' Class A common stock.

112.   In the Management Discussion and Analysis of Financial Condition and Results of Operations section of the Form 10-Q, the Company wrote:

We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings.

113.   Also in the Form 10-Q, the Company wrote:

[T]he majority of our revenue is generated by our core scrubs styles in core colors, which are in demand year-round. As a result, we have been able to produce our raw materials and finished products farther in advance and hold greater inventory without significant risk of obsolescence or exposure to seasonality.

114.   In response to a question about the Company's supply chain, Spear said:

[W]e're a uniform company, which means that our customers need our products in order to do their jobs, so demand is predictable. We have a nonseasonal business and we have a replenishment-driven business. This gives us an incredible amount of visibility into the products we need to make when we need to make them and the quantities in which to make them in. So in turn, that allows us to lock in costing and capacity and bring in goods farther in advance.

\* \* \*

[W]e're a direct-to-consumer company. Because of that, we're able to forecast even more accurately and farther in advance because we have a direct relationship with our 1.7 million customers. And we have all this data that helps us to know what product they need and when they need it. This allows us to provide 12- to 18-month rolling forecasts to our suppliers, and it also means we could adjust our calendar and our launch schedule, if there is any delay.

115.   Similarly, in response to a question from an analyst about FIGS' supply chain, Spear once again claimed:

And from a demand side, our health care professionals are demanding FIGS products and we're seeing that demand.

33

And so what we've done, and that's really why we made that decision for – in the fourth quarter, where we're bringing – we're utilizing air freight more, to get those products for our health care professionals, would we be able to see more revenue if we were able to get more products? Potentially. But I think what we've done is we forecasted a really healthy growth rate coupled with profitability that is best in class to be able to meet the demand that we're seeing.

But we're continually evaluating that. And I think one of the unique things that we also have here at FIGS is that ability to forecast that demand in a really accurate way because we're DTC, because we're data-driven.

116.   In the Risks Related to Our Business section of the Form 10-Q, the Company wrote:

[T]he ongoing COVID-19 pandemic has negatively impacted global supply chains and caused challenges to logistics, including causing ocean freight delays, port congestion, increased ocean freight rates and labor shortages. . . . As a result, certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, have experienced delays and shutdowns, and could experience delays and shutdowns again in the future. In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future, including in the fourth quarter of 2021.

117.   On the earnings call the same day, Lawrence falsely attributed the purportedly temporary need for increased air freight usage in the quarter to the COVID-19 pandemic and seasonality:

> From a supply chain perspective, we are monitoring the rapidly evolving macro challenges surrounding inbound freight, especially with the upcoming holiday season. As Trina mentioned, given these challenges, we proactively made the decision to air freight more goods during Q4 based on the demand for our products, coupled with the reality of operating a global supply chain in a COVID-19 world.

118.   Another analyst gave the Company an explicit invitation to clarify the air freight issue, asking if "the $8 million to $10 million of incremental air freight" was "a run rate that we should think about into next year" or whether FIGS expected it to "dissipat[e] as peak season passes." Spear replied:

> I mean, we really don't see that at all as a run rate and this is a transitory strategic decision that we've made. So going into 2022, we are doing a lot on our end to navigate this. And it's not just that we see the world opening up and the supply chain pressures easing, also, we've made very big moves in terms of bringing in more inventory earlier.

119.   Another analyst pressed:

> So that once we get past the air freight inflation in fourth quarter, maybe it sticks around in the first quarter, you will be doing a higher mix of units on ocean and that should be economically beneficial to where you were in the past? Or is that an incorrect assumption?

120.   And Spear replied:

> The assumption of moving actually the fourth quarter, we're taking a bit of a hit on air freight, right? We look to move those units going forward to ocean as we bring our goods in earlier. So that assumption will be – is correct.

121.   Lawrence, too, agreed:

35

And as we think about getting into 2022, our prepared remarks, we don't have a crystal ball, but we're pretty confident that we're going to see less air freight overall than we're seeing it in Q4 as we get into '22. So we don't think it's going to be air freight business ongoing. That was really just a reaction to the in-transit issues that everyone's having.

122.   On January 10, 2022, the Company released unaudited and preliminary financial results for Q4 and FY 2021, and delivered a presentation at the 24th Annual ICR Conference.

123.   During the conference, Turenshine and Spear made materially false and misleading statements regarding the stability of FIGS' business and profitability arising from its core products strategy and regarding FIGS' continuing use of air freight.

124.   Turenshine emphasized FIGS' core products strategy as key to FIGS's stability of margins and profitability, stating in relevant part:

So I've been a part of building this business and really have a deep understanding of the drivers of our gross margin and really firmly believe that many of the structural advantages that we get from being a replenishment uniform business are what are going to be able for us to deliver on that 70%-plus gross margin. So we've been very consistent in this metric, even as we've continued to innovate and really build out the lifestyle portion of our business. And we've been able to maintain it despite a lot of the macro supply chain challenges that we've been facing recently. So it gives us a lot of confidence in our ability to be able to continue to do that.

A lot of this comes from, as I mentioned, the structural advantages that we have in our business. So we're a uniform replenishment business. 90% of our fabrication – 90% of our revenue is from the same fabrication. 80% is from the same 13 core scrubber

36

styles. So we get a lot of scale and costing efficiencies as we grow, and we're able to take those benefits and really put them back into innovating in the lifestyle product and building out some of those categories while not seeing a change in kind of the overall gross margin.

125.   During the ICR Conference, Spear and Turenshine attempted to downplay FIGS' reliance on air freight. For instance, Spear emphasized that the Company's use of air freight had reached its "peak," stating in relevant part:

I think in terms of the business, from a supply chain perspective, we saw in the fourth quarter we utilized air freight to get our goods in, and we're happy that we did that. We met the demand, right? And we were able to get our products in to meet the demand and get them to our health care professionals. Going forward – and we really do view that as the peak. And so we've moved a lot of the shipments to ocean freight. We have seen rates be a bit elevated or continue to be a little bit elevated on that front. But going forward, we're excited to utilize more ocean and really continue to navigate and be best-in-class as it relates to operational excellence and supply chain excellence.

126.   Turenshine agreed, saying: "But what I can tell you is that we really do see Q4 as a peak in terms of air freight spend. And for the full year 2022, we do not anticipate needing to use the same level of air freight that we did in the prior year." She went on: "[S]o we are reducing the amount of air freight that we're using, and this is also because we put strategies in place in Q4 to be able to do that, right?"

127.   On March 8, 2022, the Company submitted a Current Report on Form 8-K to the SEC, signed by Turenshine, with its press release and shareholder letter attached. The Company also held an investor call that day, and released its Annual Report for the year ended 2021 on Form 10-K two days later (the "2021 Annual Report"), which was signed by Hasson, Spear, Turenshine, Willhite, Antrum, and Soenen.

128.   During the earnings call, Spear affirmed that the Company's core products strategy was key to maintaining a low-risk inventory model, stating in relevant part:

> The fact that half of our revenues are seasonless, enables us to produce large volumes further in advance and hold greater quantities in our warehouse with almost no inventory risk compared to traditional apparel companies. These differentiators are incredibly important because as transit times fluctuate, freight rates rise and labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%.

129.   Spear also touted the advantages that FIGS' core product strategy afforded the Company during the earnings call, stating in relevant part: "Our business is unique. It's nondiscretionary and replenishment-driven, meaning greater predictability and consistency. This is a critical advantage for us compared to other consumer brands as almost 75% of our revenue is retained in the next year, providing a solid base for us to build upon as we grow."

130.   In the 2021 Annual Report, the Company also emphasized that "[w]e have developed a highly effective merchandising strategy, anchored by our recurring, functional offering of 13 core scrubwear styles, which represented over 80% of our net revenues in 2021."

131.   In reiterating that FIGS had "a highly efficient merchandising model," the 2021 Annual Report further noted that "due to the non-discretionary, replenishment nature of healthcare apparel, [it] maintain[ed] low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

132.   The Company represented that its "DTC strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising, customer acquisition and retention,

demand forecasting and inventory optimization, leading to operational efficiencies throughout our supply chain, inventory management and new product development."

133.   The 2021 Annual Report also noted: "As a successful DTC brand with a highly effective merchandising model, we benefit from structurally advantaged product margins."

134.   With respect to its "limited edition colors and styles," the 2021 Annual Report highlighted FIGS' "disciplined buying approach," stating in relevant part:

> [W]e utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity. We launch limited edition colors, limited edition styles or new products almost every week, driving recurring traffic to our digital platform where customers often purchase limited edition products along with our core offerings. These launches not only drive interest in the limited edition products themselves, they also drive our core business. This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency.

135.   The 2021 Annual Report continued touting the Company's "Merchandising and Inventory Management," stating in relevant part:

> Through our customer ontology, we develop precisely defined customer segments and a mosaic representation of our customers. This approach enables us to understand buying behaviors, preferred DTC channels, product preferences and decision drivers. It also enables us to manage purchasing and inventory effectively and efficiently. We also use data-driven models to predict demand for our products. The high concentration of core scrubwear sales enables our models to be highly predictive, which reliably extends to limited edition launches, and we

are able to anticipate optimal times for launch, including day of week and time of day.

136.   The Form 10-K filed on March 10, 2022 also included several speculative and contingent risk factors for risks that already transpired:

If we are unable to accurately forecast customer demand, manage our inventory and plan for future expenses, our results of operations could be adversely affected.

We base our current and future inventory needs and expense levels on our operating forecasts and estimates of future demand. To ensure adequate inventory supply, we must be able to forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . . Accordingly, if we fail to accurately forecast customer demand, we may experience excess inventory levels or a shortage of products available for sale. Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer and could impair the strength and premium nature of our brand.

137.   With respect to air freight, the 2021 Annual Report indicated that FIGS used it as a mere stopgap measure to respond to COVID-19 and related macro conditions, stating in relevant part:

The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays and unreliability, port congestion, increased ocean and air freight rates and labor shortages.

* * *

In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time, and may continue from time to time, to ship goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future.

138.   Similarly, the 2021 Annual Report stated:

The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, reliability and capacity issues, port congestion, increased ocean and air freight rates and labor shortages. . . .

As we seek to timely and cost effectively fulfill orders and ship products to our customers, we have been able to continue to produce our products without significant disruptions and have taken successful measures to mitigate these macroeconomic challenges to which we are not immune. For example, to meet our customers' expectations, we have from time to time shipped goods earlier when possible and adjusted shipments to alternate origin and destination ports to avoid delays. We have also from time to time used faster but more expensive air freight in the quarter and year ended December 31, 2021, which increased our cost of goods sold.

Our replenishment-driven model has also been a key part of our ability to navigate these challenges. Nearly 90% of our production utilizes our main scrubwear fabric technology FIONx and almost half of our revenue is generated by our core scrubwear styles in core colors, which are in demand year-round. As a result, we have been able to

41

produce our raw materials and finished products farther in advance and hold greater inventory without significant risk of obsolescence or exposure to seasonality.

We believe we have managed effectively through COVID-19 logistical challenges. We nevertheless expect we will continue to contend with elevated ocean and air freight rates, unpredictable ocean transit times and other COVID-19 related logistical challenges.

139.  On May 12, 2022, after the market closed, FIGS issued a press release announcing disappointing financial results for the first quarter of 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K. The press release revealed that FIGS' gross margin was 71.2%, which represented a 0.4% year-over-year decrease. The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates," which it claimed was "partially offset by improvements in product costing."

140.  The press release also revealed that FIGS slashed its expected net revenues, gross margin, and EBITDA despite having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 earnings call. The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to $530 million based purportedly on "supply chain challenges and broader macroeconomic factors, including high inflation and shifts in consumer spending patterns." The Company previously expected gross margin to be 70% or greater but lowered it to 67 to 68% "primarily due to a significant increase in the Company's use of air freight to help mitigate supply chain challenges." While Adjusted EBITDA was previously expected to be upwards of 20%, the Company adjusted its expectations margin to 16 to 18%.

141.  During the Company's earnings call that same day, Spear revealed that the Company lacked the visibility into inventory management that they professed to

have, which resulted in the use of expensive air freight for less in-demand products while new color launches and stocked-out styles remained on ocean freight.

142.   On April 26, 2022, the Company filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Spear, Antrum, Hasson, Lin, Soenen, Lafeley, Wilke, and Willhite solicited the 2022 Proxy Statement which contained material misstatements and omissions. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*, to elect Defendants Spear and Antrum (who are named as defendants in the Securities Action) to the Board.

143.   In addition to statements concerning the Code of Conduct, the 2022 Proxy Statement notes, with respect to "Board Leadership Structure and Role in Risk Oversight:"

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board that address risks inherent in their respective areas of oversight. While our Board is responsible for monitoring and assessing strategic risk exposure, our Audit Committee is responsible for overseeing our major financial risk and enterprise

exposures and the steps our management has taken to mitigate such exposures, including the structure, design, adoption and implementation of our risk management policies and internal control systems. The Audit Committee also oversees management of cybersecurity risks and approves or disapproves any related person transactions. Our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. Our Nominating and Corporate Governance Committee manages risks associated with the independence of our Board and governance matters. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

144. In addition to the other reasons described herein, the 2022 Proxy Statement was materially misleading because it failed to disclose that the Individual Defendants violated the Code of Conduct, and contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

145. On February 28, 2023, FIGS issued a press release announcing disappointing financial results for the fourth quarter and full year 2022 ("FY2022 PR") that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K. The FY2022 PR revealed that FIGS had a 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year of year with Q4 2021 and 9.1% compared year of year with FY2022. FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment increase.

146. The FY2022 PR further revealed a dismal financial outlook for 2023

with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11%-12%. Recognizing that these disappointing results stood in stark contrast to their Relevant Period misstatements, Turenshine attempted to allay investor concerns for the Company's future in the FY2022 PR, stating in relevant part:

> Our growth outlook for 2023 is not representative of the growth we believe we can achieve long term. That is why we plan to keep investing while managing our business prudently through near term macro and cost challenges. We remain a distant leader in our industry and we are confident that we can accelerate growth and deliver adjusted EBITDA margin expansion in the future.

147.   In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023, on unusually high trading volume. In comparison, on the same day, the CRSP Total Market Index declined only 0.40% and the S&P 500 Apparel, Accessories and Luxury Goods Index decreased only 0.12%.

148.   Tulco and Tull earned $565 million from the sale of its shares in the IPO, which paled in comparison to the money earned by the Company in the IPO, which totaled $96 million. Tulco and Tull sold off a little more than $6 million additional shares for proceeds of over $255 million in the SPO. On March 21, 2022, less than a year after the IPO and when the stock was below the $22 IPO price, Tulco distributed its remaining shares to its members.

149.   Hasson and Spear began to cash out in the SPO. As FIGS itself admitted, insider sales of a substantial number of shares of FIGS stock was a significant risk to the Company and likely to put tremendous downward pressure on the stock price. However, less than four months after the IPO, having sold the investing public on FIGS' unique DTC model and data capabilities, and with FIGS'

share price inflated to a near-Relevant Period high by such promises, Hasson, Spear, Tulco, and Tull received an early release from their lock-up agreements and sold over ten million FIGS shares in the SPO.

150.   Hasson, Spear, Tulco, and Tull unloaded over $400 million of FIGS stock in the SPO at $40.25 per share. On September 16, 2021, the day after the SEC deemed the SPO Registration Statement effective, FIGS shares closed at a price of $42.42 per share. FIGS share price has experienced a consistent and precipitous decline ever since, only topping $42.42 per share once (on November 5, 2021), falling permanently below $30 by December 10, 2021, and falling below its IPO price by January 2022. Hasson and Spear still, however, continued to make illegal sales throughout the Relevant Period.

151.   The insider sales of Hasson are further detailed below:

| Date of Sale | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 9/20/21 | 2,419,998 | $40.25 | $97,404,920 |
| 11/15/21 | 75,164 | $34.29 | $2,577,374 |
| 11/29/21 | 2,904 | $32.79 | $95,222 |
| 12/2/21 | 71,292 | $30.60 | $2,181,535 |

152.   The insider sales of Spear are further detailed below:

| Date of Sale | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 9/20/21 | 1,468,324 | $40.25 | $59,100,041 |
| 11/15/21 | 89,060 | $34.29 | $3,053,867 |
| 11/29/21 | 3,540 | $32.79 | $116,077 |
| 12/2/21 | 84,889 | $30.60 | $2,597,603 |

153.   As a result of the foregoing, Securities Action was filed against the Company, its Co-CEOs Hasson and Spear, and three other members of the current Board (Willhite, Antrum, and Soenen), among several other top Company executives, which has caused and will continue to cause the Company to expend significant sums of money.

## **DAMAGE TO FIGS**

154.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including the costs of defending and potentially paying class wide liability in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

## **DERIVATIVE ALLEGATIONS**

155.    Plaintiff brings this action derivatively for the benefit of FIGS to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

156.    Plaintiff will adequately and fairly represent the interests of FIGS and its stockholders in enforcing and prosecuting its rights.

157.    Plaintiff is an owner of FIGS common stock and has been a continuous shareholder of Company stock at all relevant times.

158.    At the time this action was commenced, the Board consisted of Defendants Hasson, Spear, Willhite, Lafley, Wilke, Lin, Soenen, and Antrum (the "Director Defendants"). Plaintiff is only required to show that four of the eight Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all eight Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

159.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged

herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

160.   Defendants Hasson, Spear, Willhite, Antrum, and Soenen reviewed and authorized their signatures on the false and misleading SPO Offering Documents.

161.   The 2021 Annual Report, which also contained materially false and misleading statements and omissions as detailed above, was signed by Hasson, Spear, Willhite, Antrum, and Soenen.

162.   Defendants Spear, Antrum, Hasson, Lin, Soenen, Lafeley, Wilke, and Willhite solicited the 2022 Proxy Statement that likewise contained material misstatements and omissions. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*, to elect Defendants Spear and Antrum (who are named as defendants in the Securities Action) to the Board. Defendants Hasson and Spear also signed the false and misleading 2022 Proxy Statement.

163.   In addition, Defendants Hasson, Spear, Willhite, Antrum, and Soenen have been named as defendants in the Securities Action and, therefore, face a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. These defendants, who comprise half of the current Board, face a substantial likelihood of liability in the Securities Action and, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon them would be futile.

164.   On March 21, 2022, Tulco and Tull distributed the remaining FIGS stock to its members in-kind on a pro-rata basis. Tulco distributed 27,426,398 shares to Tull and 3,147,432 shares to Willhite, around 47.2% and 5.4% respectively of Tulco's 58,000,932 shares.

165.   At all relevant times, Willhite was simultaneously operating within the scope of his authority as the Tulco designee on the FIGS Board.

166.   Lafley has also served as a member of the board of directors of Tulco,

LLC since September 2017.

167.   Wilke is also Chairman of the board of directors of Re:Build, of which Thomas Tull is also a member.[2]

168.   In fact, in the Company's most recent proxy statement, filed with the SEC on Form 14A, dated April 25, 2023, FIGS acknowledged that because it is a "controlled company" for purposes of the NYSE listing requirements, "our stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE."

169.   A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that all nine of the Director Defendants are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

170.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

171.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not

_____

[2]      https://www.post-gazette.com/business/development/2023/05/01/re-build-manufacturing-massachusetts-new-kensington-alcoa-building/stories/202305010034 ("The deal received a big assist from billionaire Thomas Tull, a minority investor in the Steelers and the former Legendary Entertainment CEO who has made his home in Pittsburgh. Mr. Tull, chairman and CEO of Tulco LLC, an artificial intelligence company, is a Re:Build board member.")

disinterested parties.

172.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

173.   Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

174.   Defendants Soenen (Chair), Wilke, and Lin serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal and regulatory compliance, and public disclosure requirements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of, the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

175.   The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Directors violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of

liability for breaching their fiduciary duties, and therefore demand upon them is futile.

176.   Furthermore, demand, in this case is excused as to Defendants Hasson, Spear, Willhite, and Lafley because each is tied to, and/or beholden to Thomas Tull and defendant Tulco. These Directors have longstanding business and personal relationships that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Hasson, Spear and Willhite (Tulco's designee on the FIGS Board) and part of the Company's Control Group which is bound together under the Voting Agreement. Likewise, Defendant Lafley has ties with Tulco by virtue of his service as a member of the Tulco board of directors.

177.   Moreover, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

## COUNT I
### Violations of Section 14(a) of the Exchange Act
### Against The Individual Defendants

178.   Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

179.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides:
It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

180.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act,

provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.   Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement negligently failed to disclose that contrary to its descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

182.   The 2022 Proxy Statement also failed to disclose that the Company's financial statements during the Relevant Period could not be relied upon and the Company's internal controls suffered serious deficiencies and were not adequately maintained.

183.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of Defendants Spear and Antrum as directors of the Board.

184.   By virtue of, *inter alia*, the materially false and misleading statements in the 2022 Proxy Statement, the Individual Defendants solicited the votes of FIGS shareholders, including that of Plaintiff, for the re-election of Defendants Spear and Antrum to the Board. The false and misleading elements of the 2022 Proxy Statement led to, among other things, the re-election of Defendants Spear and Antrum to the Board, which allowed them to breach or continue to breach their fiduciary duties to FIGS.

185.    The Company was damaged as a result of the Individual Defendants' negligent issuance of material misrepresentations and omissions of material facts from, the Proxy Statements.

186.    Plaintiff, on behalf of FIGS, has no adequate remedy at law.

<u>COUNT II</u>
**Breach of Fiduciary Duty (*Caremark*) and/or Insider Selling (*Brophy*)**
**Against the Individual Defendants**

187.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

188.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

189.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

190.    The Individual Defendants breached their fiduciary duties of good faith, candor, loyalty, and due care by making and/or authorizing false and misleading statements concerning the Company's business, finances, and the adequacy of its internal controls.

191.    During the Relevant Period, the Individual Defendants intentionally or recklessly made false statements and misrepresented that FIGS had an exceptionally effective and low-risk merchandising model, supported by advanced data-related capabilities and a reliable set of non-discretionary core styles. The Individual Defendants also falsely stated or misrepresented that FIGS could efficiently manage inventory and primarily utilize ocean freight for freight-in, except in extraordinary circumstances such as those caused by COVID-19.

192.    In addition, during the Relevant Period, the Individual Defendants failed to disclose that FIGS had engaged in a high-risk merchandising that involved

developing numerous new styles every quarter without testing the demand for these styles beforehand.

193.   FIGS also either neglected to consider data and analytics when placing purchase orders or lacked the necessary data capabilities to accurately predict demand, and the Individual Defendants making false statements made false statements concerning increased inventory and air freight costs.

194.   Throughout the Relevant Period, the Individual Defendants failed to maintain adequate internal controls, including with respect to the accuracy of its public reports. The Individual Defendants made false and misleading statements that the Company did in fact maintain adequate internal controls.

195.   The Individual Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

196.   During the Relevant Period, while the Company's stock price was artificially inflated, and while in possession of material non-public Company information, Defendants Hasson, Spear, and Tulco sold shares of Company stock for millions of dollars in profits.

197.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FIGS has sustained significant damages as alleged herein. As a result, the Defendants are liable to the Company.

198.   Plaintiff, on behalf of FIGS, has no adequate remedy at law.

## COUNT III
### Unjust Enrichment
### Against the Individual Defendants

199.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

200.   By their wrongful acts and omissions, the Individual Defendants were

unjustly enriched at the expense of, and to the detriment of, FIGS.

201.   The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to FIGS.

202.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

203.   As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

204.   Plaintiff has no adequate remedy at law.

## COUNT IV
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

205.   Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

206.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

207.   Plaintiff has no adequate remedy at law.

## COUNT V
### Waste of Corporate Assets
### Against the Individual Defendants

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

210. The Individual Defendants wasted corporate assets by, among other things, incurring and paying legal costs to defend the Company and its officers against the Securities Action.

211. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

212. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

213. Plaintiff, on behalf of FIGS, has no adequate remedy at law.

### COUNT VI
**Violations of Sections 10(b) and 21D of the Exchange Act
Against Defendants Hasson, Spear, Willhite, Antrum, and Soenen for
Contribution**

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215. FIGS, Defendant Hasson, Spear, Willhite, Antrum, and Soenen are named as defendants in the Securities Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hasson, Spear, Willhite, Antrum, and Soenen willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of FIGS.

216.   These Defendants, because of their positions of control and authority as controlling shareholder, officers and/or directors of FIGS, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of FIGS, including the wrongful acts complained of herein and in the Securities Action.

217.   Accordingly, Defendants Hasson, Spear, Willhite, Antrum, and Soenen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

218.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Hasson, Spear, Willhite, Antrum, and Soenen.

219.   Plaintiff, on behalf of FIGS, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of FIGS and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.   Directing FIGS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FIGS and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

• strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

• strengthening the Company's internal reporting and financial disclosure controls;

• developing and implementing procedures for greater shareholder input

into the policies and guidelines of the Board; and

• strengthening the Company's internal operational control functions.

D. Awarding to FIGS restitution from the Individual Defendants; Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: June 2, 2023

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Rachele R. Byrd*

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085

*Attorneys for Plaintiff*

29638

58

## <u>VERIFICATION</u>

I, Paige McMurtrie, have reviewed the allegation made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true, I further declare that I am a current holder, and have been a holder, of FIGS, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of May 2023.

5/31/2023

DocuSigned by:

Paige McMurtrie

9B63DAC50B71401...

Paige McMurtrie